Jones *v.* Turner.

[MONROE GENERAL TERM, September 3, 1866. *Welles, E. Darwin Smith* and *Johnson*, Justices.]

## JONES *vs.* TURNER.

In 1855 J. and T. were respectively owners of adjoining premises situated on a mill stream, across which stream there was a dam, on the lands of T. below the lands of J. In the spring of that year a dam gave way at the head of the stream, and the flood cut away the embankment of the stream, above T.'s dam, and swept over the lands of J., through a new channel, doing considerable damage, to him, as well as to the N. Y. and E. Railroad Company, whose road-bed it crossed. In January, 1856, the railroad company proposed to J. and T. that if they would grant to the company the right to enter upon their premises, respectively, for that purpose, the company would, at its own expense, construct and forever maintain, a dam across the new channel, connecting it with T.'s dam then across the old channel, and thus not only restore the water to the former channel, but prevent it from flowing down the new channel, to its own and J.'s injury. A grant was accordingly made by J. and T. and other land owners, to the company, of the right to build and maintain a dam for such purpose, and to enter upon the lands at all times thereafter, for the purpose of building, maintaining and repairing the same. The agreement containing this grant recited the breaking of the bank

Jones *v.* Turner.

by the flood of 1855, and its injurious consequences to J. and the company, and the liability of those parties to further injury "unless a permanent dam be erected and maintained for the purpose of restoring the waters of said creek to its original channel and retaining said waters in said channel during flood times." In the spring of 1856 the railroad company proceeded to erect, and did erect, a dam across the new channel, in the vicinity of the former natural bank, employing J. to construct the same for the company. J. agreed to bear, and did bear, a part of the expense, and the company the rest. In June, 1857, another flood occurred in the stream, which, in consequence, as claimed, of the obstruction of T.'s dam in the channel, undermined the dam so built by J. for the company, and carried it away, and the waters passing over J.'s land, caused him great damage. In an action by J. against T. to recover the amount of damages so occasioned, *it was held:*

1. That had J.'s injury happened from the same cause, before the flood of 1855 had washed away the natural bank of the creek at the point where the water which occasioned the injury sued for, broke through, there would have been little or no doubt as to J.'s right to recover. That in that case an overflow of the creek upon J.'s land, occasioned by the obstruction of T.'s dam in the channel, would have given J. a clear and indisputable right of action to recover his damage.

2. That this state of things was altered by the flood of 1855, which washed away, entirely, the natural bank of the stream at the point of overflow, and made an entire new channel upon and across J.'s land, changing and diverting the entire volume of water from T.'s premises to and upon the premises of J. And that the case was to be considered in reference to the new condition of things occasioned by the flood of 1855, and the subsequent action of the land owners and the railroad company, in reference thereto.

3. That T. was not responsible for the injurious effects of the flood of 1855, which resulted from causes over which he had no control, and which, as respected him, at least, were produced by an inevitable casualty.

4. That T. might, had he so elected within a reasonable time after the new channel was formed, have reclaimed the stream, and restored it to its former channel upon his own land, by filling up the new channel at the point where the natural bank was washed away, and restoring the bank as nearly as might be to its former condition. But that he could not be compelled by any process known to the law to restore it; and that in the meantime he was not responsible for its flowing in the new channel, or for any damage it might thereby do to J.'s premises.

5. That the dam built in the spring of 1856 was the dam of the railroad company, and not the dam of T., who was under no obligation to build or maintain it; the company having undertaken to do both.

6. That the agreement between the parties, for the restoration of the dam, was entered into in view of the legal relations of the parties to each other, and of the respective rights and obligations between them, respectively, as they then stood, and not as they had existed at some former period; and that the agreement must be so construed.

Jones *v.* Turner.

7. That T. not having expressly or impliedly agreed to remove or lower his dam, the presumption was that it was understood the dam was to remain as it then was; and that such should be the construction of the agreement.

8. That the relations and liabilities which existed between the parties, previous to the flood of 1855, were not restored by the agreement. That it was not the intention to restore them, but to create others altogether different.

9. That T. never agreed to warrant against the effects of his dam upon the new structure; and that such new structure must be presumed to have been erected with reference to that obstruction being continued there.

10. That under the new arrangement T. might, without being amenable to either of the other parties to it, at all times afterwards, maintain his dam at its then height.

11. That it was erroneous to charge the jury that J. and T., after the restora- of the water, under the agreement, stood upon the same footing, in respect to the stream and to each other, precisely as they did before the flood of 1855 destroyed the natural bank and changed the current.

12. That if T. should be held liable, after the restoration under the agreement, for the consequences of the obstruction caused by his dam, upon the same principles and to the same extent that the law held him previous to the flood of 1855, it could only be upon the condition that the natural bank had been replaced, or some structure substituted for it clearly equal in height and strength to the former natural bank.

13. And that the jury should, in that view, have been instructed that, inasmuch as the parties injured by the flood of 1855 had undertaken to restore the stream to its former channel, for their own benefit and protection, they could could not hold T. liable according to the former condition of things, unless they had fully restored the former bank, or furnished some substitute in its place, fully equal in point of height and power of resistance.

14. That T. not having elected to restore the stream, himself, but having merely assented that others might do it, who had elected to restore it for their own benefit and security, and who entered into an agreement with him for that purpose, and constructed the new work under such agreement, making the structure their own, for all the purposes of maintenance and security to themselves, for all time; and T. having done nothing to change the state of things, since that agreement was made, and performed by the railroad company, through J. as its agent, by which the risk to the company, or to J., or their liability to injury, had been in any degree increased, was not liable for the giving away of their structure, in 1857, or any damages consequent thereon.

APPEAL from a judgment entered on the verdict of a jury. The Goodhue creek, about twelve miles long, runs into the Canisteo river from the north, through a narrow gorge in the mountain. At the base of the mountain the creek turns

square to the right and runs across the low lands and into the river. The plaintiff has, since 1822, owned a farm which lies south of the gorge, and his house is located directly in front of the mouth of the gorge, and between it and the river. His lands come within a few feet of the original bank of the creek at the point where it turns to the right at the base of the hill. The defendant owns the land west of the plaintiff's farm, covering both banks of the creek. In 1844, Tiffany & Mapes, who then owned the defendant's lands, built a dam about one hundred and fifty feet below the sharp turn in the creek, for the purpose of conducting the water to a tannery operated by them. They built it originally four sticks high above the apron, which was laid on the bed of the stream, but they soon removed one stick from the top, and it has since been maintained at the reduced height. Paxton & Turner bought of Tiffany & Mapes before 1855, and owned the property at that time. At the head of Goodhue creek was a dam ten or twelve feet high which formed a pond of over one hundred acres, about twelve feet deep. The stream was rapid, and upon it were six or eight high dams which formed large ponds above each. In the spring of 1855 the large dam at the head of the creek gave way, permitting the whole mass of the water of the large pond to escape into the stream, down which it rushed, carrying away every dam on the stream, gathering force from the contents of each pond, and bearing with it towards and into the Canisteo valley stones, trees, houses, logs, mills, brush, floodwood, human beings, and in short, every thing within the reach of the flood. This flood is described as approaching in a solid wall of water from five to ten feet high, vastly beyond the capacity of the banks of the stream to contain, and when it reached the mouth of the gorge, instead of following the bed of the stream around the hill, it kept directly on over the bank, across the plaintiff's farm, partially undermining his dwelling house, and covering a large part of his farm with the accumulations gathered on its way. In its passage

across the valley it covered the Erie railway track with stones and earth to the depth of six feet, for a long way. It washed away the bank of the creek near the turn, and formed a channel in a direct line from the point where the creek turned, over the plaintiff's farm, which was over fifty feet wide and from two to four feet deep, through which all the waters of Goodhue creek continued to flow after the flood had subsided; thus wholly changing the natural channel of the creek, and entirely diverting the water from the defendant's tannery.

For obvious reasons the plaintiff and the railroad company desired to have the stream restored to its original channel, and in January, 1856, the parties interested made the agreement which is contained in the case, reciting the injuries which the plaintiff and the railroad company had sustained, and the apprehension of similar injuries unless the same was prevented. Under this agreement the plaintiff agreed with the railroad company to build the dam provided for in the agreement, and did construct a dam for the purpose therein contemplated; and the defendant repaired his tannery dam, making it in all respects as it was before the flood of 1855. The dam erected by the plaintiff was carried away by a rise in the stream in the spring of 1857, which would not have carried away the original bank if it had been there. The result of the washing away of the dam so constructed by the plaintiff under the agreement with the railroad company, was that the plaintiff's farm was again flooded by the water passing on to it through the channel washed out by the flood of 1855, his crops were injured and his fences destroyed. For such injury the plaintiff recovered, in this action, a verdict for $739.

A motion was made, at a special term, for a new trial, which was denied, and the defendant appealed.

*D. Rumsey,* for the appellant.

*.John W. Dininny,* for the respondent.

*By the Court,* JOHNSON, J.   The only question in this case, which requires any serious consideration, is that lying at the foundation of the plaintiff's right of action, under all the facts and circumstances disclosed by the proofs and allegations of the respective parties to the controversy.   The question thus presented is one of no little interest, and is by no means free from difficulty in its solution.   After the most careful and diligent search, I have not been able to find any decided case, involving the same question, or any question having any apparent analogy to this.   ·It is, I think, a case of first impression, and depends for its just and proper determination, upon the right application of the general principles of the law of water courses.

Had the plaintiff's injury happened from the same cause before the great flood of 1855 had washed away the natural bank of the creek, at the point where the water which occasioned the present injury broke through, there would, I should say, under the other facts in the case, have been little or no doubt as to the plaintiff's right to recover.   In that case an overflow of the creek upon the plaintiff's land, occasioned by the obstruction of the defendant's dam in the channel would have given the plaintiff a clear and indisputable right of action to recover his damages.   But this state of things had all been altered by the flood of 1855, which washed away entirely the natural bank of the creek at the point of overflow, and made there an entire new channel and bed for the stream upon and across the plaintiff's land, and changing and diverting the entire volume of water, from the defendant's premises, where it had flowed time out of mind, to and upon the premises of the plaintiff.   The case must therefore be considered in reference to the new condition of things occasioned by the flood of 1855, and the subsequent action of the plaintiff and defendant in connection with other parties, in reference thereto ; and it is to be seen and determined how far, and in what particulars, if at all, the rights and liabili-

Jones *v.* Turner.

ties of the parties to this action have been changed or modified thereby.

It is conceded on all hands that the defendant was in no respect responsible for the injurious effects of the flood of 1855. Most clearly those effects resulted from causes over which he had no control, and as respects him at least, were produced by an inevitable casualty. So far as the defendant was concerned, the natural bank of the creek was destroyed, and the new channel created upon the plaintiff's land not unlawfully. After that event, as between these parties, the waters of the creek flowed through the new channel across and upon the plaintiff's land lawfully and properly, and for the time being, and until they were restored to their ancient channel, the creek was wholly the property of the plaintiff as far as it flowed exclusively upon his land. (*Angell on Water Courses,* § 57. 3 *Kent's Com.* 428.) The defendant might, undoubtedly, had he so elected, within a reasonable time after the new channel was formed, have reclaimed the stream, and restored it to its former channel upon his own land, by filling up the new channel at the point where the natural bank was washed away, and restoring the bank as nearly as might be to its former condition. It broke out upon his own land, and his right to replace and restore the water thus ecaping to its former and natural course upon his own land would, I should think, admit of no doubt. But in such a case he should undoubtedly act seasonably, and within a reasonable time. By acquiescing in the new condition of things too long, he might forfeit and lose all right to restore and reclaim. It was held in *Woodbury* v. *Short,* (17 *Verm. Rep.* 387,) that the defendant, by acquiescing in the flow of the waters of a creek in a new channel, caused by an extraordinary flood, through his own land, for a period of ten years, had lost the right to stop up such new channel and restore the water to the former channel through the plaintiff's land. But the general right to reclaim and restore, where one can do it upon his own premises, is founded

in sound reason and sustained by authority. In principle it is quite analogous to the right of one to erect mounds and barriers upon his own land, to prevent a change in the channel of a stream and confine it in its present natural channel, which he may lawfully do, provided such erection do not cast the water in an unusual quantity or manner upon the adjacent proprietor. (*Angell on Water Courses*, §§ 33, 34.) Whether the plaintiff would have had the right to go upon the defendant's lands and put up a dam or embankment, in the place of the former natural bank, in order to restore the stream to its former channel, without the consent of the latter, may perhaps be doubted. But it is in no respect material to the question before us. The defendant did not elect to restore the stream to his premises, on his own account, by replacing the bank swept away, or by any other structure. So far as appears, he had elected to let it remain and flow over the plaintiff's land in the new channel until the agreement in respect to it was entered into between the plaintiff and the defendant and another on one side, and the Erie Railway Company on the other. Up to that time, after the flood of 1855, his only right to the stream, after it entered upon the plaintiff's premises, was the right to reclaim it for future use, which he had not exercised, and for aught that appears, never intended to exercise. It had then continued to flow in the new channel for nearly a year. The defendant could not have been compelled, by any process known to the law, to restore it, and he was in the mean time no more responsible for its flowing in the new channel, or for any damage it might thereby do to the plaintiff's premises, than he would have been had the stream always flowed through that channel. The defendant's dam then stood across the old empty channel, where he had the perfect right to have it, at such height as he might elect to have it remain. It had then stood there for many years, and while the stream had continued to flow in the old channel, and the natural bank remained, it had caused no injury or damage to any one. It had occasioned.

no overflow of the stream upon the plaintiff's land; it was not a nuisance in any respect, but a perfectly lawful and useful structure, entitled to the protection of the law. By the flood of 1855, which, as respects the defendant, and as between him and the plaintiff, may properly be regarded as a providential occurrence, the dam is rendered comparatively useless to the defendant, but remains there entirely harmless to the plaintiff. It had never done any mischief, and was thus rendered incapable of doing any, and no one could allege aught against it, or against the defendant for maintaining it there. Under other circumstances the change of the course of the stream by the flood of 1855, might have proved advantageous to the plaintiff, so that he would not have desired its restoration to the former channel. But as it was, it was injurious both to the plaintiff, and to the Erie Railway Company, whose road bed the new channel crossed. Here then was a new state of things entirely, detrimental to all parties, but which neither had occasioned, and no one of them liable to either of the others for the injurious consequences. It might remain so, at the election of those concerned, but it admitted of a remedy. The parties concluded to remedy it, and entered into a mutual compact for that purpose. Neither of the parties elected to act upon his own responsibility, and restore things to their former condition, upon any assumed legal right existing at the time in his favor, but they each and all elected to enter into a mutual agreement to remedy the evil, providing in express terms, at whose expense, and upon what terms and conditions, the stream should be returned to its former bed, and who should be at the expense of confining it there for all future time. The railway company, as it would seem, and is to be inferred, proposed to the plaintiff and the defendant, that if they would grant to the company the right to enter upon their premises, respectively, for that purpose, the company would, at its own expense, construct, and forever maintain, a dam across the new channel, connecting it with the defendant's dam then across the

old channel, and thus not only restore the water to the former channel, but prevent it from flowing down the new channel to their own and the plaintiff's injury. A grant is accordingly made by the plaintiff, and the defendant, and the other owners of lands, under seal, of the right to build and maintain a dam for such purpose, and to enter upon said lands, at all times thereafter, for the purpose of building, maintaining and repairing the same. This grant is delivered to and accepted by the company, and it proceeded to erect a dam across the new channel, in the vicinity of the former natural bank, in the spring of 1856. The plaintiff was employed by the company to construct this dam, and did construct it for them. Whose dam was this when so constructed? It was, it seems, partly upon the lands of the plaintiff, but mostly upon the premises of the defendant. Clearly it was the dam of the railway company, and not the dam of the defendant. He was under no obligation to build or maintain it, and the company had undertaken with him and the plaintiff to do both, in consideration of the grant of the right and privilege of entering for that purpose. This grant recites the breaking of the bank by the flood of 1855, and its injurious consequences to the plaintiff and the company, and the liability of those parties to further injury, "unless a permanent dam be erected and maintained for the purpose of restoring the waters of said creek to its original channel, and retaining said waters in said channel during flood times." The obvious purpose of all parties is thus explicitly declared to be, to restore the water to the former channel, and retain it there "during flood times." The dam was constructed under the arrangement, and in reference to its terms and provisions, solely. Now upon what basis of right did the several parties to this arrangement proceed in entering into it? Clearly not upon that which existed between the parties prior to the flood of 1855. That basis no longer existed. The relations of the parties in respect to their legal rights, and their obligations to each other, in the matter of this

stream of water, had all been changed by that event. The defendant had neglected to reclaim the water, and perhaps could not afford to do so, in view of the relative expense and the advantages of the operation. At any rate the other parties could not compel him to do it. Hence the agreement.

As matter of law, therefore, the agreement was entered into in view of the legal relations of the parties to each other, and of the respective rights and obligations between them, respectively, as they then stood, and not as they had existed at some former period, and the agreement must be so construed. The stream is accordingly restored, under the agreement to which the plaintiff was a party, and by virtue of its provisions alone. It is restored in view of the condition of things, and the new relations then existing. It is agreed that the new structure shall be attached to the defendant's dam, then lawfully and properly there, and the design is to build so as to retain the water in the channel "at flood times," as things then were. The defendant did not expressly or impliedly agree to remove or lower his dam. Had he been requested to make that condition a part of the agreement, he might, and undoubtedly would, have withheld his assent from it, and thus frustrated the whole scheme. The presumption is, I think, that it was understood the dam was to remain as it then was, and such should be the construction of the agreement, there being no provision to the contrary. It is clear enough, I think, that the same relations and liabilities which existed between these parties previous to the flood of 1855, were not restored by this agreement. It is manifest that it was not intended to restore them, but to create others altogether different. And this they did. Providence had destroyed all the old relations, or essentially changed them, and other rights and relations sprouted and grew from the new root of the agreement. The defendant did not undertake to remove his dam, nor to clear out the channel of the creek as the flood left it, and assumed no responsibility in respect to the effect of his dam, as it then

stood, upon the restored current. He never agreed to warrant against the effects of his dam against the new structure, and such new structure must be presumed to have been put in with reference to that obstruction being continued there. Under this arrangement the defendant might, I think, without being amenable to either of the other parties to it, at all times afterwards maintain his dam at its then height. He would have no right to increase its height afterwards, and might be responsible for any injury arising from such increased height ; but there is no evidence or pretense that he did this. The injury complained of was occasioned by the breaking away of the railway company's dam, which the plaintiff himself built. The action proceeded upon the theory that the plaintiff and defendant, after the restoration of the water, under the agreement, stood upon the same footing, in respect to the stream and to each other, precisely, as they did before the flood of 1855 destroyed the natural bank and changed the current. This was the theory upon which the action was tried, and the case given to the jury by the judge's charge. The jury were so charged, expressly. This, I think, was a fundamental error, in view of all the facts and circumstances. The dam was not built to restore the water to the channel, as it was originally, before any dam was there, but to restore it and confine it to the channel as it was with the dam and other obstructions then in it, and in full view of all the parties to the arrangement. The exception to this portion of the charge was, I think, well taken.

In any view of the case, if the defendant should be held liable, after the restoration under the agreement, for the consequences of the obstruction of his dam, upon the same principles and to the same extent that the law held him previous to the flood of 1855, it could only be upon the condition that the natural bank had been replaced, or some structure substituted for it, clearly equal in height and strength to the former natural bank. And the jury should, in that view, have been instructed that inasmuch as the parties injured by

the casualty of the extraordinary flood, had undertaken to restore the stream to its former channel, for their own benefit and protection, they could not hold the defendant liable, according to the former condition of things, unless they had fully restored the former bank, or furnished some substitute in its place, fully and unquestionably equal in point of height and power of resistance. This point was nowhere clearly and distinctly presented to the jury, as a condition precedent to the defendant's liability. But I do not see that this precise point is any where raised, by any exception, or any request to charge, and refusal. There was considerable evidence upon the point, and it is somewhat conflicting. How the jury would have found, had the question been distinctly presented upon the evidence, can not now be determined. What the learned judge did charge, upon this subject, was substantially this; that if the defendant's dam remained in 1857 as it was in 1855, before the flood, and the jury believed that the injury would not have occurred had the bank remained as it was before that flood, the plaintiff could not recover. This, it will be seen, is quite a different question, and evades the material point, as to the actual height and strength of the new structure. It left the jury to speculate as to whether, after all, the same injury might not have occurred had the old bank remained there, in view of the volume of water and its velocity, and other circumstances, even though the new dam was not, as much of the evidence tended to show, equal in height and strength to the old bank.

It might be, perhaps, and I am inclined to the opinion that the rule would be, in case the defendant had voluntarily elected and undertaken to restore the water, himself, to its former channel, for his own benefit and advantage, that he would have been bound to make the bank or dam across the new channel in every respect equal to the old bank, and been liable for any damage resulting from his failure in that regard. And in case he had accomplished this, and substituted something every way equal to the natural bank, I am not prepared

to say that, as between him and the plaintiff, in such case, the relations and liabilities existing before the diversion of the stream would not have been substantially restored. But there is a wide and manifest distinction between such a case and this, where the defendant did not elect to restore the stream, himself, but merely assented that others might do it, who had elected to do it for their own benefit and security, and who entered into an agreement with him for that purpose, and constructed the new work under such agreement, making the structure their own, for all the purposes of maintenance and security to themselves for all time. The defendant having done nothing to change the state of things since that agreement was made and performed by the railway company, through the plaintiff as their agent, or partially performed, by which the risk to the company, or to the plaintiff, or their liability to injury, has been in any degree increased, is not liable for the giving away of their structure, or any damages consequent thereon.

The judgment must therefore be reversed, and a new trial ordered, with costs to abide the event.

[MONROE GENERAL TERM, September 3, 1866. *Welles, E. Darwin Smith,* and *Johnson,* Justices.]